## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MATTHEW CIMA**,

    c/o Barry J. Pollack
    Robbins Russell Englert Orseck
     Untereiner & Sauber LLP
    2000 K St. NW, 4th Floor
    Washington, D.C. 20006

    *Plaintiff*,

               **v.**

**JOHN DOES 1–20,**

    United States Park Police
    110 Ohio Drive SW
    Washington, D.C. 20242

    United States Secret Service
    245 Murray Lane SW – BLDG T-5
    Washington, D.C. 20223

    D.C. National Guard
    201 E Capital Street SE
    Washington, D.C. 20003

    Federal Bureau of Investigation
    935 Pennsylvania Avenue NW
    Washington, D.C. 20535

    Drug Enforcement Administration
    600-700 Army-Navy Drive
    Arlington, Virginia 22202

**JOHN DOES 21–40,**

    D.C. Metropolitan Police Department
    Henry J. Daly Building
    300 Indiana Avenue NW
    Washington, D.C. 20001

**JOHN DOES 41–60,**

Case No.

**COMPLAINT AND JURY DEMAND**

1

Arlington County Police Department
2200 Wilson Blvd. Suite #102
Box #317
Arlington, Virginia 22201

and

**THE DISTRICT OF COLUMBIA,**

*Service on:*
The Honorable Muriel Bowser
Mayor, District of Columbia
1350 Pennsylvania Avenue NW
Washington, D.C. 20004

The Honorable Karl Racine
Attorney General, District of Columbia
441 Fourth Street, N.W.
Washington, D.C. 20001,

*Defendants*.

## COMPLAINT AND JURY DEMAND

Comes now Plaintiff Matthew Cima, by and through undersigned counsel, who states the following:

### INTRODUCTION

1.      Between approximately 9:30 p.m. and 11:00 p.m. on May 31, 2020, state and federal law enforcement officers, without provocation, violently attacked peaceful protestors speaking out against police violence in the area in and near Lafayette Square, which sits between the White House in Washington, D.C. and what is now Black Lives Matter Plaza.  Before the District of Columbia's evening curfew took effect, Matthew Cima was lawfully and peacefully assembling and exercising rights guaranteed to him by the First Amendment and was surrounded by others who were doing the same.  Without warning, law enforcement officers deployed canisters containing chemical irritants and fired sting balls, pepper balls, or other projectiles into

2

the crowd of peaceful protestors a short distance away.  Mr. Cima was hit in the face with one of these projectiles in or near his left eye, causing him significant and permanent injuries.  At the time, Mr. Cima was unarmed, had his hands above his head, and posed absolutely no physical threat to any law enforcement officer.

2.      Mr. Cima was present at and participated in the protest in Lafayette Square on the evening of May 31, 2020.  Like many other protestors that day, Mr. Cima went to Lafayette Square to speak out peacefully against systemic racism in the United States and, in particular, discriminatory police brutality against African Americans and other people of color.  This protest, like many across the country that week, was motivated in part by the videotaped killing of George Floyd at the hands of Minneapolis police officers in broad daylight on May 25, 2020.  Mr. Floyd died when a police officer pinned him to the ground, on a public street, and held his knee on Mr. Floyd's neck for eight minutes and forty-six seconds—despite Mr. Floyd's audible, repeated cries for help—while other police officers stood by and watched.

3.      The force employed against Mr. Cima was excessive and in violation of his constitutional rights.  None of the law enforcement officers at the time he or she deployed chemical irritants and fired projectiles at Mr. Cima had any legitimate basis to believe that his or her life or physical safety was at risk; nor would any reasonable officer have thought so.  Mr. Cima posed no physical threat to any officer or to any other person.  Any reasonable law enforcement officer would understand that it is unlawful for that officer to employ force against someone who is committing no criminal offense and posing no threat to officers, other people, or property

4.      As a result of law enforcement officers' actions on May 31, 2020, Mr. Cima has, to date, undergone four surgeries to his eye.  Despite the surgeries, he still has a significant vision impairment in his left eye, and medical professionals do not believe that he will ever recover full

vision.  He has suffered and continues to suffer severe physical, mental, and emotional pain as a result of law enforcement officers' actions on May 31, 2020.

## PARTIES

5.      Plaintiff Matthew Cima is a citizen of the United States and a resident of Washington, D.C., who was demonstrating peacefully in Lafayette Square on the evening of May 31, 2020.

6.      Defendants John Does 1–20 are federal officers employed by the United States Park Police, United States Secret Service, the District of Columbia National Guard, the Federal Bureau of Investigation, the Drug Enforcement Agency, and/or other federal law enforcement agencies who directed and/or were present and participated in the attack on peaceful protestors from in and near Lafayette Square on May 31, 2020.  They are sued in their individual capacities.

7.      Defendants John Does 21–40 are officers and agents of the Metropolitan Police Department ("MPD") and other non-federal law enforcement officers, agents, and/or officials based in the District of Columbia who directed and/or who were present and participated in the attack on and violent removal of peaceful protestors from in and near Lafayette Square on May 31, 2020.  They are sued in their individual capacities.

8.      Defendants John Does 41–60 are officers and agents of the Arlington County Police Department ("ACPD") and other non-federal law enforcement officials from jurisdictions other than the District of Columbia who directed and/or were present and participated in the attack on and removal of peaceful protestors from in and near Lafayette Square on May 31, 2020, at the direction of federal officers.  They are sued in their individual capacities.

9.      The United States Park Police is a subdivision within the Department of the Interior, an executive agency under the President's authority.  Its immediate chain of command ends with

the Chief of Police, who is, and was on May 31, 2020, Gregory Monahan.[1]  The United States

Park Police Assistant Chief of Police oversees the Field Operations Division, which is "responsible

for all operational activities of the Force in the Washington metropolitan area" and includes the

"Patrol Branch," whose personnel patrol areas in and around Washington, D.C.[2]

10.    The United States Secret Service is a subdivision within the Department of

Treasury, an executive agency under the President's authority.  Its immediate chain of command

ends with the Director, who is, and was on May 31, 2020, James Murray.

11.    The District of Columbia National Guard's chain of command ends with the

President of the United States.[3]  The intermediate officer is the Commanding General, who is, and

was on May 31, 2020, Major General William J. Walker.  "[T]he Commanding General of the

D.C. National Guard is subordinate solely to the President of the United States."[4]  *The New York

Times* reported on June 10, 2020:  "General Walker[, the commanding general of the D.C. National

Guard,] likes to call his troops 'the President's Guard' and sometimes even the 'Praetorian Guard'

because of their unusual chain of command ultimately to the president.  He has close ties to the

Trump White House:  General Walker's top legal officer, Col. Earl Matthews, once worked as a

senior member of the National Security Council and left under the cloud of the Ukraine scandal

last year."[5]

---

[1] *Office of the Chief*, U.S. PARK POLICE,  https://www.nps.gov/subjects/uspp/office-of-the-chief.htm (last visited July 8, 2020).

[2] *Field Operations Division*, U.S. PARK POLICE, https://www.nps.gov/subjects/uspp/ops.htm (last visited July 8, 2020).

[3] *About Us*, DISTRICT OF COLUMBIA NAT'L GUARD, https://dc.ng.mil/About-Us/ (last visited July 15, 2020).

[4] *Id.*

[5] Thomas Gibbons-Neff et al., *Aggressive Tactics by National Guard, Ordered to Appease Trump, Wounded the Military, Too*, N.Y. TIMES (June 10, 2020), https://www.nytimes.com/2020/06/10/us/politics/national-guard-protests.html.

12.     The Federal Bureau of Investigation ("FBI") is an agency within the United States Department of Justice, an executive agency under the President's authority.[6] The FBI's immediate chain of command ends with the Director, who is, and was on May 31, 2020, Christopher Wray.[7]

13.     The Drug Enforcement Agency ("DEA") is an agency within the United States Department of Justice, an executive agency under the President's authority.[8] The DEA's immediate chain of command ends with the Administrator.  The Acting Administrator is, and was on May 31, 2020, Timothy J. Shea.[9]

14.     The MPD is a law enforcement agency of the District of Columbia government, operating under the leadership of the Mayor of the District of Columbia, who is, and was on May 31, 2020 Muriel Bowser.[10] Its immediate chain of command ends with the Chief of Police, who is, and was on May 31, 2020, Peter Newsham.[11]

15.     The ACPD is a law enforcement agency of the Arlington County, Virginia government, generally operating under the leadership of the County Manager, who is, and was on

---

[6] *See Organization, Mission and Functions Manual:  Federal Bureau of Investigation*, U.S. DEP'T OF JUSTICE, https://www.justice.gov/jmd/organization-mission-and-functions-manual-federal-bureau-investigation (last visited July 16, 2020).

[7] *Leadership & Structure: FBI Executives*, FBI, https://www.fbi.gov/about/leadership-and-structure (last visited July 16, 2020).

[8] *See Organization, Mission and Functions Manual:  Federal Bureau of Investigation*, U.S. DEP'T OF JUSTICE, https://www.justice.gov/jmd/organization-mission-and-functions-manual-federal-bureau-investigation (last visited July 16, 2020).

[9] *DEA Leadership*, DRUG ENFORCEMENT ADMIN., https://www.dea.gov/divisions/dea-leadership (last visited July 16, 2020).

[10] *Government of the District of Columbia Organizational Chart as of January 15, 2019*, https://mayor.dc.gov/publication/government-district-columbia-organizational-chart (attachment) (last visited July 20, 2020).

[11] *Organizational Chart*, METROPOLITAN POLICE DEP'T, Feb. 21, 2020, https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/MPD%20Org%20Charts_UPDATED_02212020.pdf.

May 31, 2020, Mark Schwartz.[12]  ACPD officers who were present and participated in the attack on protestors in and near Lafayette Square on the evening of May 31, 2020 were operating under the direction of the United States Park Police, who had requested their presence and assistance. As such, ACPD officers were acting under color of federal law on the evening of May 31, 2020 in Lafayette Park.[13]

16.     Defendant District of Columbia is a municipal corporation.  The District of Columbia, by and through its agents, is responsible for the supervision and operation of the MPD. The District of Columbia is responsible for the negligent and intentional tortious actions of MPD officers acting under the scope of their employment.

## FACTS

### For over 100 years, people have met in Lafayette Square to protest.

17.     Widespread protests gripped major cities across the United States following the death of George Floyd at the hands of Minneapolis police on May 25, 2020.  Relevant to this case, in Washington, D.C., large-scale protests took place each day between May 29, 2020 and June 1, 2020 in and near Lafayette Square.

18.     Lafayette Square is located directly opposite the White House, in Northwest, Washington, D.C.  It is bordered by Pennsylvania Avenue, N.W, on the south; H Street, N.W., on the north; 15th Street, N.W., on the east; and 17th Street, N.W., on the west.  For more than 100 years, Lafayette Square (including its adjacent streets) has been a gathering place for political

---

[12] *Arlington County Government Organization Chart*, ARLINGTON COUNTY, https://arlingtonva.s3.dualstack.us-east-1.amazonaws.com/wp-content/uploads/sites/6/2018/03/ArlingtonVA_org_chart_03-30-18.pdf (last visited July 16, 2020).

[13] *Interagency Agreement between Arlington County Police Department and the United States Spark Police*, ARLINGTON COUNTY, Jan. 9, 2017, https://arlingtonva.s3.amazonaws.com/wp-content/uploads/sites/21/2020/06/InteragencyAgreement.ACPDandUSPP.12.12.16.pdf, ¶ 6.

demonstrations and for groups and individuals to exercise their First Amendment rights.  In other words, it has traditionally been used for the purposes of public assembly, communicating thoughts between citizens, and discussing questions of public importance.[14]

**State and local law enforcement officers were present
in and near Lafayette Square on the evening of May 31, 2020.**

19.     State and federal law enforcement officers—including but not limited to officers and agents of the United States Secret Service, the United States Park Police, the MPD, the District of Columbia National Guard, the DEA, the FBI, and the ACPD—were present in and near Lafayette Square during the protests held there on May 31, 2020:

    a.      On May 31, 2020, District of Columbia Mayor Muriel Bowser ordered a city-wide curfew beginning at 11:00 p.m.  By 7:00 p.m., she informed the public that she  "ha[d] activated the DC National Guard to support the Metropolitan Police Department."[15]

    b.      Between May 25 and May 31, 2020, the Acting Administrator of the DEA, Timothy J. Shea, submitted a memorandum to the Office of the Deputy Attorney General, requesting that the Attorney General expand the DEA's investigative authority beyond "enforcing Federal crimes related to drugs" and allow the DEA to "be designated to enforce any federal crime committed as a result of protests over the death of George Floyd" "on a nationwide basis for a period of fourteen days" so as to assist in "maintain[ing] and/or restor[ing] order."  The DEA's request included authority to: "(1) conduct covert surveillance and protect against threats to public

---

[14] *See, e.g.*, *Protest at the People's House*, The White House Historical Ass'n, https://www.whitehousehistory.org/collections/protest-at-the-peoples-house (last visited July 16, 2020).

[15] Press Release, *Mayor Bowser Orders a Citywide Curfew for the District of Columbia from 11 pm on Sunday, May 31 until 6 am on Monday, June 1*, District of Columbia Government (May 31, 2020), https://dc.gov/release/mayor-bowser-orders-citywide-curfew-district-columbia-11-pm-sunday-may-31-until-6-am-monday; @MayorBowser, Twitter (May 31, 2020; 7:04 PM), https://twitter.com/MayorBowser/status/1267230528002023425.

safety; (2) share intelligence with federal, state, local, and tribal counterparts; (3) if necessary, intervene as Federal law enforcement officers to protect both participants and spectators in the protests; and (4) if necessary, engage in investigative and enforcement activity including, but not limited to, conducting interviews, conducting searches, and making arrests for violations of Federal law."  At approximately 3:30 p.m. on May 31, 2020, the request was approved.[16]

      c.    At the Mayor's press conference on June 1, 2020, District of Columbia Chief of Police Peter Newsham stated that, on the evening of May 31, 2020, the MPD "worked closely with our law enforcement partners, particularly with the DEA and the FBI, who were readily available to provide resources.  We continue to work with the U.S. Park Police, the U.S. Secret Service, and the U.S. Secret Service Uniformed Division.  The tactics that I saw last night, by the people, the antagonists, I will call them, appeared to be organized in nature.  In some instances MPD had to deploy OC spray and sting ball to control some of the crowd activity." Additionally, Chief Newsham stated that, "last night [May 31, 2020], the National Guard was primarily in support of the Park Police."[17]

      d.    On June 2, 2020, the ACPD issued a press release stating that it was withdrawing its police officers who had been "detailed to the District of Columbia on Sunday, May 31, under a longstanding Mutual Aid agreement with the United States Park Police.  The officers were asked to assist in the response to protests sparked by the May 25 death of George Floyd at the hands of Minneapolis police officers."  The statement continued:  "On Sunday, May 31, those officers, along with two Police commanders, were stationed near Lafayette Park, where

---

[16] Memorandum from Timothy J. Shea, Acting Administrator of the Drug Enforcement Agency, to the Deputy Attorney General, https://www.documentcloud.org/documents/6935297-LEOPOLD-DEA-Memo-George-Floyd-Protests.html (last visited July 8, 2020).
[17] DC Mayor's Office, *Mayor Bowser Holds Media Availability, 6/1/20* (June 1, 2020), https://www.youtube.com/watch?v=M8w2ya_mDtY.

large crowds of protesters had gathered. They were held in reserve until approximately 10:30 p.m.

when they were deployed to help move protesters back from H Street, to make it possible for

firefighters to put out fires that had been set in shops and stores along the street."[18]

       e.     At approximately 9:30 p.m. on May 31, 2020, Mr. Cima personally

observed and photographed law enforcement officers in Lafayette Square holding shields labeled

"U.S. Park Police" and "Police."



From a photograph taken by Matthew Cima on the evening of May 31st, 2020

       20.     Between May 29 and May 31, 2020, the President of the United States, Donald J.

Trump, advocated for law enforcement officers to use violent force against civil rights protestors

speaking out in the wake of George Floyd's death.  President Trump made several statements that

conveyed his negative views of the protestors and applauded law enforcement officers' violent

---

[18] Press Release, *Arlington's Decision to Withdraw its Police Officers from the District of Columbia* (June 2, 2020), https://newsroom.arlingtonva.us/release/arlingtons-decision-to-withdraw-its-police-officers-from-the-district-of-columbia/.

responses to them.  In these statements, he described the protestors in derogatory terms, celebrated officers' use of force against them, and advocated for law enforcement's continued use of force in the coming days:

      a.     On May 29, 2020, the President tweeted that "the very weak Radical Left Mayor, Jacob Frey," either must "get his act together and bring the City [of Minneapolis] under control, or I will send in the National Guard & get the job done right….."[19] "…. These THUGS are dishonoring the memory of George Floyd, and I won't let that happen.  Just spoke to Governor Tim Walz and told him that the Military is with him all the way.  Any difficulty and we will assume control but, when the looting starts, the shooting starts.  Thank you!"[20]

      b.     The phrase "when the looting starts, the shooting starts," was used by former City of Miami Police Chief Walter Headley in 1967 when he advocated for police brutality and discriminatory police tactics against African Americans and other people of color in order to purportedly reduce crime in Miami.  Politician George Wallace, who ran on a segregationist platform, also used the phrase during his 1968 presidential campaign.[21]  Twitter responded by stating that the President's tweet violated its rules by "glorifying violence."[22]

---

[19]    @realDonaldTrump, TWITTER (May 29, 2020; 12:53 AM), https://twitter.com/realDonaldTrump/status/1266231100172615680.

[20]    @realDonaldTrump, TWITTER (May 29, 2020; 12:53 AM), https://twitter.com/realDonaldTrump/status/1266231100780744704.

[21] Barbara Sprunt, *The History Behind 'When the Looting Starts, the Shooting Starts'*, NPR (May 29, 2020), https://www.npr.org/2020/05/29/864818368/the-history-behind-when-the-looting-starts-the-shooting-starts; Michael S. Rosenwald, *'When the looting starts, the shooting starts': Trump quotes Miami police chief's notorious 1967 warning*, WASH. POST (May 29, 2020), https://www.washingtonpost.com/history/2020/05/29/when-the-looting-starts-the-shooting-starts-trump-walter-headley/.

[22] *See* @realDonaldTrump, TWITTER (May 29, 2020; 12:53 AM), https://twitter.com/realDonaldTrump/status/1266231100780744704.

c.      On May 30, 2020, he tweeted: "Great job last night at the White House by the U.S. @SecretService.  They were not only totally professional, but very cool.  I was inside, watched every move, and couldn't have felt more safe.  They let the 'protesters' scream & rant as much as they wanted, but whenever someone got too frisky or out of line, they would quickly come down on them, hard – didn't know what hit them.  The front line was replaced with fresh agents, like magic.  Big crowd, professionally organized, but nobody came close to breaching the fence.  If they had they would have been greeted with the most vicious dogs, and most ominous weapons, I have ever seen.  That's when people would have been really badly hurt, at least.  Many Secret Service agents just waiting for action.  'We put the young ones on the front line, sir, they love it, and good practice.'  As you saw last night, they were very cool & very professional.  Never let it get out of hand.  Thank you!  On the bad side, the D.C. Mayor, @MurielBowser, who is always looking for money & help, wouldn't let the D.C. Police get involved.  "Not their job." Nice!"[23]

d.      The President's celebration of using "vicious dogs" against the civil rights protestors gathered to demonstrate against police brutality in May 2020 alluded to historic and ongoing police practices of using dogs to intimidate, harm, and assault civil rights protestors and, specifically, African Americans and other people of color.[24]

e.      Later that day, Mayor Bowser and Chief Newsham contradicted the President's tweet concerning the MPD's lack of participation in quelling protestors' activities.

---

[23]      @realDonaldTrump, TWITTER (May 30, 2020; 8:41 AM), https://twitter.com/realDonaldTrump/status/1266711221191020544 (complete tweet thread) (alterations adopted).

[24]      See, e.g., Sydney Trent, *Trump's warning that 'vicious dogs' would attack protesters conjured centuries of racial terror*, WASH. POST (June 1, 2020, https://www.washingtonpost.com/history/2020/06/01/trump-vicious-dogs-protesters-civil-rights-slavery/.

Mayor Bowser stated during a press conference that MPD officers were "already involved" in responding to protestors and "supported uniformed Secret Service last night [on May 29, 2020] like we have done literally dozens of times at Lafayette Park.  MPD, the U.S. Park Police, and the Secret Service coordinated throughout the evening and night and at no time was the Chief of Police concerned about losing control of protest activity in Washington, D.C."[25]

    f. The President also tweeted on May 30, 2020:  "The professionally managed so-called 'protesters' at the White House had little to do with the memory of George Floyd.  They were just there to cause trouble.  The @SecretService handled them easily.  Tonight, I understand, is MAGA NIGHT AT THE WHITE HOUSE???"[26]

**Mr. Cima attended the protest at Lafayette Square on the evening of May 31, 2020.**

21. Mr. Cima arrived at the civil rights protest at Lafayette Square on May 31, 2020 at approximately 8:45 p.m.  He attended the protest with his girlfriend.

22. At the time Mr. Cima arrived at the protest that evening, the group of protestors was peaceful.  They chanted, sang, and displayed signs reflecting their viewpoints and political demands to end systemic racism and police brutality.  At times during the evening, Mr. Cima joined others in chanting "Black lives matter."

23. As described above, both federal and law enforcement officers were present in and near Lafayette Square on May 31, 2020, including agents from the United States Park Police, United States Secret Service, the District of Columbia National Guard, DEA, FBI, MPD, and ACPD.

---

[25] DC Mayor's Office, *Mayor Bowser Holds Media Availability, 5/30/20* (May 30, 2020), https://www.youtube.com/watch?v=80oo-gpPQtc.

[26] @realDonaldTrump, Twitter (May 30, 2020; 9:34 AM), https://twitter.com/realDonaldTrump/status/1266724553620930561.

24.     Both federal and law enforcement officers agreed to work together and made collective decisions about how to interact with and respond to the protestors in Lafayette Square that evening through a "unified command" between the MPD and those federal agencies with agents present in and near Lafayette Square:

a.     At Mayor Bowser's press conference on May 30, 2020, Chief Newsham stated that, on the night prior (May 29, 2020), the MPD "established unified command with the U.S. Park Police and the U.S. Secret Service on site, which we do on the multiple occasions when we have these instances of protests in our city.  This is the common way we handle this on a very regular basis.  The unified command is established so that police departments and law enforcement agencies and their federal partners can collectively make decisions on how to proceed.  I was in close contact with the MPD Incident Commander on the scene.  The Uniformed Secret Service had sufficient personnel to control their line.  This is how we always handle these matters in our city."[27]

b.     At the same press conference, Chief Newsham stated that the "unified command" would continue, particularly in the areas near the White House, in order to respond to protestors there:  "Generally, down in that area, MPD has responsibility for the street.  Last night, Uniformed Secret Service has primary responsibility for protecting the White House.  That is shared with the U.S. Park Police.  And we have responsibility for the street down there.  So that's why we established the unified command.  The unified command has worked remarkably well in dozens of other situations.  We have protests in this city on a daily basis.  To have a thousand protestors in Washington, D.C. is not uncommon, and it is a very manageable group.  I keep

---

[27] DC Mayor's Office, *Mayor Bowser Holds Media Availability, 5/30/20* (May 30, 2020), https://www.youtube.com/watch?v=80oo-gpPQtc.

emphasizing this – the leadership was very comfortable with the way that that happened last night."  Further:  "All of the decisions that are made in an instance like this is made in unified command.  A collective decision was made on how to proceed.  That's the way we handled it last night and early this morning.  That's the way that we will handle it tonight and for any ongoing demonstrations that we have in our city."[28]

c.     Chief Newsham described the "unified command" at the May 30, 2020 press conference as follows:  "It's a place where leaders, decisionmakers, get together and they collectively agree how to proceed to ensure that all of the individual responsibilities of each of the agencies is taken care of.  As you know, we have a unique series of jurisdictions here in the District of Columbia.  Each of the law enforcement agencies has a unique responsibility. The Metropolitan Police Department overlays most of that responsibility in that we have responsibility for the entire City.  We have responsibility for local crime.  We have responsibility for any demonstrations that occur in our city streets.  And our ultimate responsibility is to ensure that everyone is safe when we have these types of events.  Like I said earlier, I have spoken to the leadership of all of those agencies that were involved last night.  They are absolutely comfortable with the decisions that were made."[29]

d.     At a press conference on June 2, 2020, Chief Newsham supplemented his description of the "unified command":  "Whenever you establish unified command, you bring in decision makers from the agencies that are involved in Washington, D.C. Those agencies have specific and inconsistent jurisdictions.  And the idea behind unified command is to come up with a collective decision."  Further, he stated:  "We have a number of command posts set up throughout

---

[28] *Id.*
[29] DC Mayor's Office, *Mayor Bowser Holds Media Availability, 5/30/20* (May 30, 2020), https://www.youtube.com/watch?v=80oo-gpPQtc.

the city where federal and local partners can communicate, including our [command center] at Police Headquarters."[30]

25.     At all times on the evening of May 31, 2020, Mr. Cima protested peacefully.  In Lafayette Square, officials had erected barricades in an east-west line, effectively bifurcating the Square.  Thus, the south end of the Square, typically available for First Amendment-protected activity, was unavailable to members of the public.  The northern end of the Square, however, remained available for such activity.  Law enforcement officers maintained a line standing immediately behind the barricades on the south side of the barricades, facing north.  Most, if not all, of the officers in the line had riot shields.  Members of the public were free to protest or engage in other First Amendment-protected activity in the north end of the Square up to the barricades.

26.     Between 9:30 p.m. and 10:00 p.m., at least one hour before the curfew, a small subset of protestors at Lafayette Square, not including Mr. Cima, began throwing water bottles and other non-lethal items in the direction of law enforcement officers.  Law enforcement officers responded to the small number of protestors within the crowd who had thrown items by firing canisters containing chemical irritants, sting balls or pepper bullets, or other projectiles indiscriminately into the entire crowd.

27.     As a result, the crowd scattered, leaving the area near the barricades in Lafayette Square and retreating towards the streets surrounding Square.  Protestors were injured by law enforcement officers' actions.  Mr. Cima and others assisted one man who struggled to breathe when a canister containing a chemical irritant landed near him.  Mr. Cima and other civil rights protestors tried to move the injured man to safety, toward H Street.  Mr. Cima and the others

---

[30] DC Mayor's Office, *Mayor Bowser Holds Media Availability, 6/2/20* (June 2, 2020), https://www.youtube.com/watch?v=HuSo85vhACQ.

shielded the injured man while he cleaned his face.  While assisting the injured man, Mr. Cima was struck in the back with projectiles fired by law enforcement officers from behind the barricades.  During this time, Mr. Cima feared for his own safety.

28.     After the chemical irritants had dissipated, a smaller number of peaceful protestors walked back through Lafayette Square in the direction of the barricades.  Some of the protestors came up to the barricades and stopped.  Others were walking in the direction of the barricades and filling in behind those closest to the barricades.  After assisting the injured protestor, Mr. Cima rejoined the other peaceful protestors, walking south through Lafayette Square in the direction of the barricades.  No one in the crowd was throwing water bottles or any other item.  No one in the crowd breached the barricades.  No one in the crowd was verbally or physically threatening any of the law enforcement officers who were on the opposite side of the barricades.  As such, the crowd as a whole did not exhibit behavior that could allow a reasonable officer to believe anyone present, much less everyone present, had committed any crime.  Indeed, the crowd was lawfully and peacefully assembling prior to the 11:00 p.m. curfew, engaging in First-Amendment protected activity, in an area where such activity has traditionally occurred and that was open to the public on May 31, 2020.

**Mr. Cima was shot in the face by law enforcement without provocation and without warning while his hands were in the air and he was peacefully protesting.**

29.     Mr. Cima walked slowly, calmly, quietly, and with his hands in the air, towards the front of the group of protestors and the barricade separating the protestors and law enforcement officers, at all times staying on the side of the barricade where Lafayette Square had remained available for First Amendment-protected activity.

30.     When Mr. Cima was standing approximately ten feet to the north of the barricade and the law enforcement officers on the other side of the barricade with his hands still raised above

his head to communicate that he posed no threat, law enforcement officers standing on the south side of the barricades fired projectiles directly into the group of peaceful protestors on the north side of the barricades.  Mr. Cima was struck in the face.

31.     Mr. Cima had been back in Lafayette Square for several minutes prior to being shot. At no time during this period had the law enforcement officers instructed the protestors to leave or retreat.  No warning was given by the law enforcement officers before they began firing projectiles into the group of peaceful protestors.

32.     A projectile fired by the law enforcement officers hit Mr. Cima just under his left eyebrow.  Blood began to pool in his eye.  Mr. Cima immediately lost vision in his left eye.

33.     Mr. Cima retreated north towards H Street, NW.  Once at the street, he sought help. A medic in the area cleaned Mr. Cima's face and recommended that he immediately go to a hospital.  He advised that Mr. Cima should not move his injured left eye and therefore should cover or close his right eye to avoid having movement of that eye cause involuntary movement of his left eye.

34.     A friend of Mr. Cima had driven to the protest and agreed to drive Mr. Cima to the hospital.  Mr. Cima was led from near the intersection of 16th Street, N.W., and I Street, N.W., to his friend's parked car, near the intersection of 18th Street, N.W., and M Street, N.W.  Mr. Cima's friend drove Mr. Cima directly to the emergency room at George Washington University Hospital, in Washington, D.C.

35.     Mr. Cima arrived at the George Washington University Hospital emergency room shortly before 11:00 p.m.  When he arrived at the hospital, hospital staff would not allow Mr. Cima to enter the building because he was soaked in pepper spray or other chemical irritants. Consequently, Mr. Cima was required to take a HazMat shower before he could be treated.  Mr.

Cima was taken to a structure adjacent to the ambulance bay/loading dock, where he was stripped of all his clothes and had to shower before he could enter the hospital.

36.     Mr. Cima was treated in the emergency room.  He was diagnosed as having a hyphema—that is, blood pooling in his eye between his cornea and his iris.  He  was discharged from the hospital at approximately 5:30 a.m. on June 1, 2020.



Photograph of Matthew Cima on the evening of May 31, 2020 at George
Washington University Hospital.

**After several surgeries, Mr. Cima continues to have
significantly impaired vision in his left eye.**

37.     Mr. Cima had a follow-up vision appointment at George Washington University

Hospital on June 4, 2020.  The treating physician diagnosed retina damage and referred him to

Johns Hopkins Hospital.

38.     Doctors at the Wilmer Eye Institute at Johns Hopkins performed a surgery on June

5, 2020, in an effort to correct the vision impairment in his eye.  In a visit the day after, the doctors

noted that Mr. Cima had a "[t]raumatic full thickness macular hole" and "submacular hemorrhage"

in his left eye.

39.     Though the hole grew slightly smaller over the next two weeks, it did not heal

entirely, and so Mr. Cima underwent another surgery on June 19, 2020.  At a follow-up visit on

July 7, 2020, Mr. Cima reported that he still had a blind spot in his eye, and doctors determined

that the hole in Mr. Cima's eye remained open.

40.     Mr. Cima had another follow-up visit on July 28, 2020.  There, the doctors at the

Wilmer Institute noted that the hole in his eye had grown larger.  Mr. Cima's vision remained

impaired.  And, at a follow-up visit on August 13, 2020, Mr. Cima noted that the edges of the hole

in his vision were getting blurry, and that he saw floating and falling objects out of that eye several

times a day.

41.     Mr. Cima underwent further surgeries on his eye at the Wilmer Institute on

September 16 and September 30, 2020.  These surgeries were experimental, part of a clinical trial,

and Mr. Cima will not know whether they succeeded in restoring any more of his vision for several

weeks.

42.     Mr. Cima had 20-20 vision without corrective lenses in both of his eyes prior to

being shot by law enforcement on May 31, 2020.  Mr. Cima now has significantly impaired vision

in his left eye.  Even after four surgeries, Mr. Cima's treating physicians believe it unlikely that he will regain full vision in his left eye.  Rather, he will be permanently vision-impaired.

### Mr. Cima suffered and continues to suffer harm as a result of law enforcement officers' actions on May 31, 2020.

43.     Mr. Cima has experienced substantial physical, mental, and emotional pain and suffering as a result of law enforcement officers' unprovoked and unlawful violent actions against him on May 31, 2020.

44.     Mr. Cima suffered physical pain when law enforcement officers shot projectiles at Mr. Cima and struck him in the face.  The physical pain was intense.  Mr. Cima was also terrified that he had permanently lost vision and would become blind in his left eye.

45.     Mr. Cima has suffered ongoing mental and emotional harm since his injury.  In particular, he dreads going to sleep and is unable to remain asleep.  His nightmares have become more intense.  He now wakes up regularly, gripped with fear that he suddenly cannot see out of both eyes, and he must turn on a light to prove to himself that he is not completely blind.

46.     Mr. Cima also has suffered financially as a result of law enforcement officers' actions on May 31, 2020.  At the time of the attack, Mr. Cima was receiving unemployment compensation because, in light of the coronavirus pandemic, he was temporarily unable to work his prior jobs as a server/bartender.  Mr. Cima had been receiving unemployment compensation equivalent to his typical work week of approximately 50 hours per week.  That unemployment compensation will expire on December 25, 2020.  But, as discussed below, Mr. Cima's prospects of finding work after his unemployment expires are diminished because of the injuries he suffered on May 31, 2020.

47.     The jobs of server and bartender require vision, particularly depth perception, to perform well.  Those jobs also require lifting objects—deliveries of beer, wine, spirits, or food,

replacing kegs, etc.—but Mr. Cima's physicians have told him that if he lifts heavy objects then he may suffer further retinal damage.  Because he cannot perform certain aspects of a typical bartender or server's duties and will be impaired in his ability to perform others, Mr. Cima's future employment prospects have been harmed as a result of the injury to his left eye caused by the defendants on May 31, 2020.

48.     Mr. Cima has suffered and will continue to suffer severe physical, mental, and emotional anguish, as well as medical and other related expenses, as a result of the injury to his left eye caused by the defendants on May 31, 2020.

## JURISDICTION, VENUE, AND NOTICE

49.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because this case presents claims arising under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

50.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over claims arising under District of Columbia law.

51.     Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b)(2) and § 1391(e)(1).  Mr. Cima is a resident of the District of Columbia; the District of Columbia is the judicial district in which a substantial part of the events or omissions giving rise to Mr. Cima's claims occurred; and the Defendants in this lawsuit include officers or employees of the United States acting under color of legal authority.

52.     The District of Columbia was given notice of the claims against it, pursuant to D.C. Code § 12-309, on November 24, 2020.

## JURY DEMAND

53.     Pursuant to the Seventh Amendment of the United States Constitution, Mr. Cima requests a jury trial on any and all issues and claims raised by this Complaint which are triable by right of a jury.

## CAUSES OF ACTION

### COUNT ONE
(*Bivens* action against John Does 1–20 and John Does 41–60 for violation of Fourth Amendment rights)

54.     Mr. Cima incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

55.     Defendants John Does 1–20, federal law enforcement officers at the time of the events in question, acted under color of federal law on May 31, 2020 when they took violent action against Mr. Cima and other protestors in and near Lafayette Square between the hours of approximately 9:30 p.m. and 11:00 p.m.  Defendants John Does 41–60, local law enforcement officers acting at the request and direction of federal law enforcement officers, acted under color of federal law on May 31, 2020 when they took violent action against Mr. Cima and other protestors in and near Lafayette Square between the hours of 9:30 p.m. and 11:00 p.m.

56.     Mr. Cima has a clearly established Fourth Amendment right to be free from unreasonable and unlawful seizure of his person by law enforcement.

57.     John Does 1-20 and 41-60 violated Mr. Cima's clearly established Fourth Amendment right when John Does 1-20 and 41-60, without warning, fired projectiles at Mr. Cima—who had his hands raised as he slowly, calmly, and quietly in an area of Lafayette Square open to the public prior to the imposition of any curfew; did not pose a threat to any person or officer; and was not physically proximate to any other individual who posed such a threat— from a distance of approximately ten feet, striking Mr. Cima in the face and causing him to lose

vision in his left eye.  John Does 1-20 and 41-60 used this physical force to halt Mr. Cima's movement and force him to move from the area around the barricades set up in Lafayette Square. John Does 1-20 and 41-60 acted without a warrant and without probable cause. It was objectively unreasonable for John Does 1-20 and 41-60 to use such force against Mr. Cima under these facts and circumstances. The use of force was so excessive that no reasonable officer could have believed in the lawfulness of his actions.

58.     The actions of John Does 1-20 and 41-60 were the proximate cause of the physical injury to Mr. Cima's left eye and the mental and emotional pain and suffering that Mr. Cima sustained on May 31, 2020, in the days that followed, continuing to this day, and will continue in the future.

59.     John Does 1-20 and 41-60 acted with intent to violate Mr. Cima's constitutional rights or with deliberate, reckless, and callous indifference or disregard for Mr. Cima's rights and therefore are liable for punitive damages.

60.     John Does 1-20 and 41-60 are jointly and severally liable to Mr. Cima pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for this violation of his rights.

**COUNT TWO**
**(Violation of 42 U.S.C. § 1983 against John Does 21–40 – Fourth Amendment – Excessive Force)**

61.     Mr. Cima incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

62.     Defendants John Does 21–40, local law enforcement officers at the time of the events in question, acted under color of law on May 31, 2020 when they took violent action against Mr. Cima and other protestors in and near Lafayette Square between the hours of approximately 9:30 p.m. and 11:00 p.m.

63.     Mr. Cima has a clearly established Fourth Amendment right to be free from unreasonable and unlawful seizure of his person by law enforcement.

64.     John Does 21-40 violated Mr. Cima's clearly established Fourth Amendment right when Defendants, without warning, fired projectiles at Mr. Cima—who had his hands raised as he slowly, calmly, and quietly approached the front of the area available for protest, just north of the law enforcement barricade line; did not pose a threat to any person or officer; and was not physically proximate to any other individual who posed such a threat—from a distance of approximately ten feet, striking Mr. Cima in the face and causing him to lose vision in his left eye. John Does 21-40 used this physical force to halt Mr. Cima's movement and force him to move from the area around the barricades set up in Lafayette Square.  John Does 21-40 acted without a warrant and without probable cause.  It was objectively unreasonable for John Does 21-40 to use such force against Mr. Cima under these facts and circumstances. The use of force was so excessive that no reasonable officer could have believed in the lawfulness of his actions.

65.     The actions of John Does 21-40 were the proximate cause of the physical injury to Mr. Cima's left eye and the mental and emotional pain and suffering that Mr. Cima sustained on May 31, 2020, in the days that followed, continuing to this day, and which will continue in the future.

66.     John Does 21-40 acted with intent to violate Mr. Cima's constitutional rights or with deliberate, reckless, and callous indifference or disregard for Mr. Cima's rights and therefore are liable for punitive damages.

67.     John Does 21-40 are jointly and severally liable to Mr. Cima.

**COUNT THREE**
**(Violation of 42 U.S.C. § 1983 against John Does 41–60 – Fourth Amendment –**
**Excessive Force)**

68.     Mr. Cima incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

69.     Defendants John Does 41–60 were ACPD law enforcement officers at the time of the events in question.  In taking violent action against Mr. Cima and other peaceful protestors in and near Lafayette Square between the hours of approximately 9:30 p.m. and 11:00 p.m. on May 31, 2020, John Does 41-60, to the extent they acted outside the scope of their grant of federal power, acted under color of state law for purposes of 42 U.S.C. § 1983.

70.     Mr. Cima has a clearly established Fourth Amendment right to be free from unreasonable and unlawful seizure of his person by law enforcement.

71.     John Does 41-60 violated Mr. Cima's clearly established Fourth Amendment right when Defendants, without warning, fired projectiles at Mr. Cima—who had his hands raised as he slowly, calmly, and quietly approached the front of the are available for protest; did not pose a threat to any person or officer; and was not physically proximate to any other individual who posed such a threat—from a distance of approximately ten feet, striking Mr. Cima in the face and causing him to lose vision in his left eye.  John Does 41-60 used this physical force to halt Mr. Cima's movement and force him to move from the area around the barricades set up in Lafayette Square. John Does 41-60 acted without a warrant and without probable cause.  It was objectively unreasonable for John Does 41-60 to use such force against Mr. Cima under these facts and circumstances. The use of force was so excessive that no reasonable officer could have believed in the lawfulness of his actions.

72.     The actions of John Does 41-60 were the proximate cause of the physical injury to Mr. Cima's left eye and the mental and emotional pain and suffering that Mr. Cima sustained on

May 31, 2020, in the days that followed, continuing to this day, and which will continue in the future.

73.     John Does 41-60 acted with intent to violate Mr. Cima's constitutional rights or with deliberate, reckless, and callous indifference or disregard for Mr. Cima's rights and therefore are liable for punitive damages.

74.     John Does 41-60 are jointly and severally liable to Mr. Cima.

**COUNT FOUR**
**(Violation of 42 U.S.C. § 1983 against John Does 21–40 – First Amendment)**

75.     Mr. Cima incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

76.     Defendants John Does 21–40, MPD law enforcement officers at the time of the events in question, acted under color of law on May 31, 2020 when they took violent action against Mr. Cima and other protestors in and near Lafayette Square between the hours of approximately 9:30 p.m. and 11:00 p.m.

77.     Mr. Cima's act of assembling with other individuals to peacefully protest in Lafayette Square, a traditional public forum, against racially motivated police brutality was protected by the First Amendment to the United States Constitution.

78.     John Does 21-40 deprived Mr. Cima of his First Amendment rights when they fired projectiles at him from a distance of approximately ten feet, striking him in the face.  The deliberate actions of John Does 21-40 suppressed Mr. Cima's expression of his viewpoint, and his ability to gather with others to express that viewpoint, by physically harming him and thereby causing him to cease protesting and immediately seek emergency medical attention.  Mr. Cima left the protest as a direct result of the conduct of John Does 21-40.

79.     The use of force by John Does 21-40 was motivated by retaliatory animus towards the viewpoint that Mr. Cima and the other civil rights protestors expressed.  No reasonable officer would have believed there was probable cause to use force against or otherwise seize Mr. Cima and, in fact, no probable cause existed.  There was no reason to believe Mr. Cima had committed a crime in connection with the protests on May 31, 2020 and, in fact, he had not committed any crime.  Instead, John Does 21-40 were aware of Mr. Cima's viewpoint and acted with discriminatory purpose to prevent his expression of it.

80.     The violent actions of John Does 21-40 were not a reasonable regulation of the time, place, or manner of Mr. Cima's First Amendment-protected activity.  There was no compelling or significant government interest that justified the actions of John Does 21-40 and infringement of Mr. Cima's First Amendment rights.  Even if there were such an interest in removing peaceful protestors from in and near Lafayette Square well prior to the curfew, the actions of John Does 21-40 were not narrowly tailored to serve that governmental interest.  Mr. Cima could not continue protesting at all on May 31, 2020 or June 1, 2020 as a result of the actions of John Does 21-40.

81.     John Does 21-40 acted with intent to violate Mr. Cima's constitutional rights or with deliberate, reckless, and callous indifference or disregard for Mr. Cima's rights and therefore are liable for punitive damages.

82.     John Does 21-40 are jointly and severally liable to Mr. Cima.

**COUNT FIVE**
**(Violation of 42 U.S.C. § 1983 against John Does 41–60 – First Amendment)**

83.     Mr. Cima incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

84.     Defendants John Does 41–60 were ACPD law enforcement officers at the time of the events in question.  In taking violent action against Mr. Cima and other peaceful protestors in and near Lafayette Square between the hours of approximately 9:30 p.m. and 11:00 p.m. on May 31, 2020, John Does 41-60, to the extent they acted outside the scope of their grant of federal power, they acted under color of state law for purposes of 42 U.S.C. § 1983.

85.     Mr. Cima's act of assembling with other individuals to protest peacefully in Lafayette Square, a traditional public forum, against racially motivated police brutality was protected by the First Amendment to the United States Constitution.

86.     John Does 41-60 deprived Mr. Cima of his First Amendment rights when they fired projectiles at him from a distance of approximately ten feet, striking him in the face.  The deliberate actions of John Does 41-60 suppressed Mr. Cima's expression of his viewpoint, and his ability to gather with others to express that viewpoint, by physically harming him and thereby causing him to cease protesting and immediately seek emergency medical attention.  Mr. Cima left the protest as a direct result of the conduct of John Does 41-60.

87.     The use of force by John Does 41-60 was motivated by retaliatory animus towards the viewpoint that Mr. Cima and the other civil rights protestors expressed.  No reasonable officer would have believed there was probable cause to use force against or otherwise seize Mr. Cima and, in fact, no probable cause existed.  There was no reason to believe Mr. Cima had committed a crime in connection with the protests on May 31, 2020 and, in fact, he had not committed any crime.   Instead, John Does 41-60 were aware of Mr. Cima's viewpoint and acted with discriminatory purpose to prevent his expression of it.

88.     The violent actions of John Does 41-60 were not a reasonable regulation of the time, place, or manner of Mr. Cima's First Amendment-protected activity.   There was no

29

compelling or significant government interest that justified the actions of John Does 41-60 and infringement of Mr. Cima's First Amendment rights. Even if there were such an interest in removing peaceful protestors from in and near Lafayette Square well prior to the curfew, the actions of John Does 41-60 were not narrowly tailored to serve that governmental interest. Mr. Cima could not continue protesting at all on May 31, 2020 or June 1, 2020 as a result of the actions of John Does 41-60.

89.     John Does 41-60 acted with intent to violate Mr. Cima's constitutional rights or with deliberate, reckless, and callous indifference or disregard for Mr. Cima's rights and therefore are liable for punitive damages.

90.     John Does 41-60 are jointly and severally liable to Mr. Cima.

**COUNT SIX**
**(Violation of 42 U.S.C. § 1983 against John Does 21–40 – Fifth Amendment)**

91.     Mr. Cima incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

92.     Defendants John Does 21–40, MPD law enforcement officers at the time of the events in question, acted under color of law on May 31, 2020 when they took violent action against Mr. Cima and other protestors in and near Lafayette Square between the hours of approximately 9:30 p.m. and 11:00 p.m.

93.     Mr. Cima has a clearly established right under the Fifth Amendment to the United States Constitution not to be deprived of his liberty without due process of law.

94.     Despite this, John Does 21-40 chose to deprive him of his liberty by firing projectiles at him from ten feet away when he was holding his arms up and protesting peacefully. That deprivation of liberty took place without due process of law, and no reasonable officer would have believed that he or she was justified in acting in that manner.

95. John Does 21-40 acted with intent to violate Mr. Cima's constitutional rights or with deliberate, reckless, and callous indifference or disregard for Mr. Cima's rights and therefore are liable for punitive damages.

96. John Does 21-40 are jointly and severally liable to Mr. Cima.

## COUNT SEVEN
### (Violation of 42 U.S.C. § 1983 against John Does 41-60 – Fifth Amendment)

97. Mr. Cima incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

98. Defendants John Does 41–60 were ACPD law enforcement officers at the time of the events in question.  In taking violent action against Mr. Cima and other peaceful protestors in and near Lafayette Square between the hours of approximately 9:30 p.m. and 11:00 p.m. on May 31, 2020, John Does 41-60, to the extent they acted outside the scope of their grant of federal power, they acted under color of state law for purposes of 42 U.S.C. § 1983.

99. Mr. Cima has a clearly established right under the Fifth Amendment to the United States Constitution not to be deprived of his liberty without due process of law.

100. Despite this, John Does 41-60 chose to deprive him of his liberty by firing projectiles at him from ten feet away when he was holding his arms up and protesting peacefully. That deprivation of liberty took place without due process of law, and no reasonable officer would have believed that he or she was justified in acting in that manner.

101. John Does 41-60 acted with intent to violate Mr. Cima's constitutional rights or with deliberate, reckless, and callous indifference or disregard for Mr. Cima's rights and therefore are liable for punitive damages.

102. John Does 41-60 are jointly and severally liable to Mr. Cima.

31

## COUNT EIGHT
### (Violation of § 1985(3) against John Does 1–60)

103.     Mr. Cima incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

104.     John Does 1-60 conspired to deprive Mr. Cima and other peaceful civil rights protestors in Lafayette Square on the evening of May 31, 2020 of equal protection of the laws, in violation of 42 U.S.C. § 1985(3).  The conspirators were those who engaged in or otherwise were involved in directing or supporting law enforcement actions in and near Lafayette Square on May 31, 2020, including all of John Does 1-60.  The conspirators coordinated through the "unified command," agreeing to take collective action against the protestors.

105.     The conspiracy was motivated by a racial and class-based invidiously discriminatory animus.  The conspiracy targeted people protesting against racially discriminatory police brutality against African Americans and other people of color; in other words, African Americans, other people of color, and "those who champion[] their cause."  *United Broth. of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott* (*UBCJA*), 463 U.S. 825, 836 (1983).  These civil rights protestors constitute a protected class under 42 U.S.C. § 1985(3).  Mr. Cima is a member of this protected class.

106.     The purpose of the conspiracy was to deprive, either directly or indirectly, Mr. Cima and other members of the protected class of the equal protection of the laws; specifically, their First Amendment rights to speak, assemble, and petition the Government for redress of grievances, their Fourth Amendment rights to be free from unlawful seizure, and their Fifth Amendment rights not to be deprived of liberty without due process.  Mr. Cima and other members of this protected class were targeted because of the viewpoints of the protected class.

107.    The conspirators engaged in overt acts in furtherance of the conspiracy, including but not limited to using violent force against members of the protected class in and around Lafayette Square who were peacefully exercising their First Amendment rights and, specifically, shooting Mr. Cima in the face with a projectile.

108.    The conspirators caused Mr. Cima's physical injury and deprived him of equal protection under the law as a result of their conduct.

109.    John Does 1-60 acted with intent to violate Mr. Cima's constitutional rights or with reckless and callous indifference or disregard for Mr. Cima's rights and therefore are liable for punitive damages.

**COUNT NINE**
**(Violation of 42 U.S.C. § 1986 against John Does 1–60)**

110.    Mr. Cima incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

111.    John Does 1-60, who collectively participated in the removal of protestors from Lafayette Square on the evening of May 31, 2020 prior to the curfew, knew that there existed a conspiracy to deprive the civil rights protestors in Lafayette Square on the evening of May 31, 2020 of their constitutional rights through the use of force.

112.    John Does 1-60 had the power to prevent or aid in preventing the commission of that conspiracy but negligently failed or refused to do so.  The defendants with decision-making authority in the "unified command" could and should have refused to issue unlawful orders to use physical force against peaceful civil rights protestors, including Mr. Cima.  The defendants with subordinate roles, operating pursuant to the orders of the "unified command," could and should have refused to comply with unlawful orders, including the order to use physical force against Mr. Cima and other peaceful civil rights protestors.

113.    In light of that negligent or intentional failure or refusal, overt acts in furtherance of the conspiracy were carried out, resulting in violence that deprived Mr. Cima of his constitutional rights and which caused physical injury to Mr. Cima.

114.    John Does 1-60 acted with intent to violate Mr. Cima's constitutional rights or with deliberate, reckless, and callous indifference or disregard for Mr. Cima's rights and therefore are liable for punitive damages.

## COUNT TEN
### (Violation of § 1985(3) against John Does 1–20 and John Does 41–60)

115.    Mr. Cima incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

116.    John Does 1-20 and 41-60 conspired to deprive Mr. Cima and other peaceful civil rights protestors in Lafayette Square on the evening of May 31, 2020 of equal protection of the laws, in violation of 42 U.S.C. § 1985(3).  The conspirators were officers and agents of the United States Park Police and ACPD, who were engaged in or otherwise were involved in directing or supporting law enforcement actions in and near Lafayette Square on May 31, 2020.  The conspirators coordinated through the Interagency Agreement between ACPD and the United States Park Police, agreeing to take collective action against the protestors.

117.    The conspiracy was motivated by a racial and class-based invidiously discriminatory animus.  The conspiracy targeted people protesting against racially discriminatory police brutality against African Americans and other people of color; in other words, African Americans, other people of color, and "those who champion[] their cause."  *UBCJA*, 463 U.S. at 836.  These civil rights protestors constitute a protected class under 42 U.S.C. § 1985(3).  Mr. Cima is a member of this protected class.

118.     The purpose of the conspiracy was to deprive, either directly or indirectly, Mr. Cima and other members of the protected class of the equal protection of the laws; specifically, their First Amendment rights to speak, assemble, and petition the Government for redress of grievances and their Fourth Amendment rights to be free from unlawful seizure.  Mr. Cima and other members of this protected class were targeted because of the viewpoints of the protected class.

119.     The conspirators engaged in overt acts in furtherance of the conspiracy, including but not limited to using violent force against members of the protected class in and around Lafayette Square who were peacefully exercising their First Amendment rights and, specifically, shooting Mr. Cima in the face with a projectile.

120.     The conspirators caused Mr. Cima injury and deprived him of equal protection under the law as a result of their conduct.

121.     John Does 1-20 and 41-60 acted with intent to violate Mr. Cima's constitutional rights or with reckless and callous indifference or disregard for Mr. Cima's rights and therefore are liable for punitive damages.

## COUNT ELEVEN
### (Violation of 42 U.S.C. § 1986 against John Does 1–20 and John Does 41–60)

122.     Mr. Cima incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

123.     John Does 1-20 and 41-60, who collectively participated in the removal of protestors from Lafayette Square on the evening of May 31, 2020 prior to the curfew, knew that there existed a Section 1985 conspiracy to deprive the civil rights protestors in Lafayette Square on the evening of May 31, 2020 of their constitutional rights through the use of force.

124.     John Does 1-20 and 41-60 had the power to prevent or aid in preventing the commission of that conspiracy but negligently failed or refused to do so.  The defendants with decision-making authority under the Interagency Agreement between ACPD and the United States Park Police could and should have refused to issue unlawful orders to use physical force against peaceful civil rights protestors, including Mr. Cima.  The defendants with subordinate roles, operating pursuant to the orders given under the authority of the Interagency Agreement between ACPD and the United States Park Police, could and should have refused to comply with unlawful orders, including the order to use physical force against Mr. Cima and other peaceful civil rights protestors.

125.     In light of that negligent failure or refusal, overt acts in furtherance of the conspiracy were carried out, resulting in violence that deprived Mr. Cima and other civil rights protestors of their constitutional rights and which caused injury to Mr. Cima.

126.     John Does 1-20 and 41-60 acted with intent to violate Mr. Cima's constitutional rights or with reckless and callous indifference or disregard for Mr. Cima's rights and therefore are liable for punitive damages.

## COUNT TWELVE
### (Assault against Defendants John Does 21–40 and District of Columbia)

127.     Mr. Cima incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

128.     At all times, John Does 21-40 were acting within the scope of their employment as law enforcement officers at or near Lafayette Square on May 31, 2020 in the evening between the hours of approximately 9:30 p.m. and 11:00 p.m.

129.     John Does 21-40 intentionally and unlawfully attempted and threatened physical harm to Mr. Cima and other civil rights protestors when they fired canisters of chemical irritants

36

and projectiles into the crowd of peaceful protestors in Lafayette Square on May 31, 2020.  The actions of John Does 21-40s involved excessive use of force and were not reasonable under the circumstances.

130.    John Does 21-40 caused Mr. Cima to suffer apprehension of harmful and offensive contact when John Does 21-40 intentionally fired canisters of chemical irritants and projectiles into the crowd of protestors, of which Mr. Cima was a part.

131.    A reasonable person in Mr. Cima's position would have experienced such apprehension.

132.    John Does 21-40 acted with ill will, recklessness, wantonness, oppressiveness, willful disregard of Mr. Cima's rights, or otherwise in a manner tending to aggravate Mr. Cima's injury that warrants punitive damages.  John Does 21-40 acted with evil motive, actual malice, deliberate violence or oppression, or intent to injure, or in willful disregard for Mr. Cima's rights, and their conduct itself was outrageous or reckless towards Mr. Cima's safety.

133.    The District of Columbia is responsible for the intentional tortious actions of its employees acting within the scope of their employment.  The actions of John Does 21-40 constitute extraordinary circumstances that warrant punitive damages from the District of Columbia.

**COUNT THIRTEEN**
**(Assault against Defendants John Does 21–40 and District of Columbia)**

134.    Mr. Cima incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

135.    At all times, John Does 21-40 were acting within the scope of their employment as law enforcement officers in Lafayette Square on May 31, 2020 in the evening between the hours of approximately 9:30 p.m. and 11:00 p.m.

136.    John Does 21-40 intentionally and unlawfully attempted and threatened physical harm to Mr. Cima when they fired projectiles at Mr. Cima from a short distance away.

137.    John Does 21-40 caused Mr. Cima to suffer apprehension of harmful and offensive contact when John Does 21-40 intentionally fired projectiles at Mr. Cima from a short distance away.

138.    A reasonable person in Mr. Cima's position would have experienced such apprehension.

139.    John Does 21-40 acted with ill will, recklessness, wantonness, oppressiveness, willful disregard of Mr. Cima's rights, or otherwise in a manner tending to aggravate Mr. Cima's injury that warrants punitive damages.  John Does 21-40 acted with evil motive, actual malice, deliberate violence or oppression, or intent to injure, or in willful disregard for Mr. Cima's rights, and their conduct itself was outrageous or reckless towards Mr. Cima's safety.

140.    The District of Columbia is responsible for the intentional tortious actions of its employees acting within the scope of their employment.  The actions of John Does 21-40 constitute extraordinary circumstances that warrant punitive damages from the District of Columbia.

### COUNT FOURTEEN
### (Battery against Defendants John Does 21–40 and District of Columbia)

141.    Mr. Cima incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

142.    At all times, John Does 21-40 were acting within the scope of their employment as law enforcement officers at or near Lafayette Square on May 31, 2020 in the evening between the hours of approximately 9:30 p.m. and 11:00 p.m.

143.    John Does 21-40 intentionally, knowingly, and wrongfully caused harmful and offensive contact to Mr. Cima's body when John Does 21-40 fired projectiles at Mr. Cima from a

short distance, without provocation or warning, striking him in the face and causing injury to his left eye.

144. Mr. Cima did not consent to the contact.

145. John Does 21-40 acted with intent to cause injury and did cause injury, damage, loss, and harm to Mr. Cima as a result of their wrongful actions.

146. John Does 21-40 acted with ill will, recklessness, wantonness, oppressiveness, willful disregard of Mr. Cima's rights, or otherwise in a manner tending to aggravate Mr. Cima's injury that warrants punitive damages. John Does 21-40 acted with evil motive, actual malice, deliberate violence or oppression, or intent to injure, or in willful disregard for Mr. Cima's rights, and their conduct itself was outrageous or reckless towards Mr. Cima's safety.

147. The District of Columbia is responsible for the intentional tortious actions of its employees acting within the scope of their employment. The actions of John Does 21-40 constitute extraordinary circumstances that warrant punitive damages from the District of Columbia.

### COUNT FIFTEEN
**(Intentional infliction of emotional distress against Defendants John Does 21–40 and District of Columbia)**

148. Mr. Cima incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

149. At all times, John Does 21-40 were acting within the scope of their employment as law enforcement officers in Lafayette Square on May 31, 2020 in the evening between the hours of approximately 9:30 p.m. and 11:00 p.m.

150. John Does 21-40 acted intentionally when firing at Mr. Cima, without provocation or warning, while Mr. Cima was standing only a few feet away, with his hands in the air, and exercising his First Amendment rights in a lawful and peaceful manner.

151.    John Does 21-40 acted recklessly when firing at Mr. Cima, without provocation or warning, when Mr. Cima was standing only a few feet away, with his hands in the air and exercising his First Amendment rights in a lawful and peaceful manner.

152.    John Does 21-40 used violent and excessive force against Mr. Cima—without probable cause—while he was peacefully exercising his First Amendment rights in a public forum, well before any curfew took effect.  As a result, Mr. Cima was hit in the face with a projectile, had to seek immediate, emergency medical attention, and may have permanently lost vision in his left eye.  The actions of John Does 21-40 under these facts and circumstances were extreme, outrageous, objectively unreasonable, go beyond all possible bounds of decency, and must be regarded as atrocious and utterly intolerable in a civilized community.

153.    John Does 21-40 caused Mr. Cima to suffer severe emotional distress, which has manifested itself in symptoms including, but not limited to, severe nightmares, dreading going to sleep, and an inability to stay asleep.

154.    John Does 21-40 acted in a manner that warrants punitive damages.

155.    The District of Columbia is responsible for the intentional tortious actions of its employees acting within the scope of their employment.  The actions of John Does 21-40 constitute extraordinary circumstances that warrant punitive damages from the District of Columbia.

## COUNT SIXTEEN
### (Negligent infliction of emotional distress against Defendants John Does 21–40 and District of Columbia)

156.    Mr. Cima incorporates all allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

157.    At all times, John Does 21-40 were acting within the scope of their employment as law enforcement officers in Lafayette Square on May 31, 2020 in the evening between the hours of approximately 9:30 p.m. and 11:00 p.m.

158.    John Does 21-40 acted negligently when firing at Mr. Cima, without provocation or warning, while Mr. Cima was standing only a few feet away, with his hands in the air, and exercising his First Amendment rights in a lawful and peaceful manner.

159.    Because John Does 21-40 fired directly at, and hit, Mr. Cima, he was within the zone of physical danger from their actions.  The negligent decision to fire at Mr. Cima caused him to fear for his own safety.

160.    As a result of the negligent actions of John Does 21-40, Mr. Cima was hit in the face with a projectile, had to seek immediate, emergency medical attention, and has likely permanently lost vision in his left eye.

161.    The negligent actions of John Does 21-40 caused Mr. Cima to suffer severe emotional distress, which has manifested itself in symptoms including, but not limited to, severe nightmares, dreading going to sleep, and an inability to stay asleep.

162.    The District of Columbia is responsible for the negligent tortious actions of its employees acting within the scope of their employment.

### PRAYER FOR RELIEF

WHEREFORE, Mr. Cima demands judgment against the Defendants as follows:

163.    A judgment declaring that the acts of the Defendants described herein violated the First Amendment, the Fourth Amendment, and Fifth Amendment, 42 U.S.C. §§ 1983, 1985, and 1986, and constituted assault, battery, and intentional infliction of emotional distress;

164.    Compensatory damages in an amount to be determined at trial;

165.    Punitive damages;

166.    An award of the costs and expenses of this action, including attorneys' fees;

167.    Pre-judgment and post-judgment interest; and

168.    Any further relief that this Court may deem appropriate.


Dated:   November 30, 2020                    Respectfully submitted,

                                              */s/ Barry J. Pollack*
                                              Barry J. Pollack (DC Bar No. 434513)
                                              John B. Goerlich (DC Bar No. 1656553)
                                              ROBBINS RUSSELL ENGLERT ORSECK
                                              UNTEREINER & SAUBER LLP
                                              2000 K Street NW, 4th Floor
                                              Washington, D.C. 20006
                                              Telephone: (202) 775 4500
                                              Fax: (202) 775 4510
                                              bpollack@robbinsrussell.com
                                              jgoerlich@robbinsrussell.com

                                              *Counsel for Matthew Cima*